

FILED
JUL 1 0 2013
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>)<br>CHRISTIAN OUNANIAN AND )<br>GINA VOGEL )<br>)<br>Defendants )<br>)<br>) | No. **4-13CR0293SNLJ** |

### INDICTMENT

### COUNT ONE

The Grand Jury charges that:

**INTRODUCTION**

1.  Walgreens Corporation (Walgreens) and CVS Caremark Corporation (CVS) operate retail drug stores throughout the United States, including a number of stores within the Eastern District of Missouri.

2.  At all times relevant, Defendants Christian **Ounanian** (Ounanian) and Gina **Vogel** (Vogel) resided in St. Louis, Missouri. At times, they lived together in a home that **Ounanian** owns in the City of St. Louis.

3.  At all times relevant, Defendants **Ounanian** and **Vogel** were a couple.

**CONSPIRACY**

4. Beginning at a time unknown to the Grand Jury, but not later than the year 2007, and continuing through on or about September 2012, in the Eastern District of Missouri and elsewhere,

**CHRISTIAN OUNANIAN AND GINA VOGEL,**

the Defendants herein, knowingly and willfully conspired, combined, confederated, and agreed together with other persons, both known and unknown to the Grand Jury, to knowingly and willfully transport, transmit, and transfer in interstate commerce goods, wares and merchandise, of the value of $5,000 or more, knowing the same to have been stolen, and converted, and taken by fraud, and did aid and abet each other and other persons in violation of Title 18, United States Code, Section 2314 and 2.

**MANNER AND MEANS OF THE CONSPIRACY**

5. The defendants and co-conspirators accomplished and attempted to accomplish the objects of the conspiracy in the following manner and through the following means:

   a. At all times relevant, **Ounanian** owned and operated Xtra Wholesale, a wholesale business located in the City of St. Louis at 6008 Southwest Avenue in the Eastern District of Missouri.

   b. It was part of the conspiracy that **Ounanian** paid shoplifters, also called "boosters," to steal over-the-counter medications, health and beauty products, and other merchandise from Walgreens, and CVS.

   c. In some instances, **Ounanian** supplied boosters with lists of merchandise that he wanted them to steal.

d. After the theft, the boosters delivered merchandise in large trash bags to **Ounanian** at Xtra Wholesale, or at other locations within the Eastern District of Missouri.

e. **Ounanian** then paid the boosters for the stolen merchandise. In some instances **Ounanian** paid the boosters with cash and in some instances he paid them with checks drawn off of the Xtra Wholesale bank account or by other means unknown to the Grand Jury.

f. **Ounanian** often employed boosters who he knew where drug addicts, and who therefore were desperate for any means to make money, including stealing.

g. It was further part of the conspiracy that after the boosters delivered the stolen merchandise to **Ounanian**, he took the stolen merchandise to his home in the City of St. Louis, where **Vogel**, and others known and unknown to the Grand Jury, then inventoried and packaged the merchandise.

h. **Vogel**, and others known and unknown to the Grand Jury, removed the stolen merchandise from the trash bags, counted the merchandise, removed labels from the merchandise that would have indicated that it had not been purchased, documented how much merchandise they were going to send to the purchaser of the merchandise, and weighed and packaged the merchandise.

i. **Ounanian** then drafted an invoice using the inventory information calculated by **Vogel**, and others known and unknown to the Grand Jury, and included on the invoice the merchandise he was going to send to purchasers. **Ounanian** also included on invoices, among other things, the "normal" (or retail) price of the item, the discounted price **Ounanian** was selling the item for, the number of each item that

was included in the shipment, and the amount **Ounanian** was charging for the merchandise included in the shipment.

j. **Ounanian** then faxed or mailed the invoice from the Eastern District of Missouri to purchasers of the stolen merchandise in New Jersey, New York, Texas, and Idaho to alert the purchaser that the merchandise on the invoice was about to be shipped, or that it had been shipped.

k. It was further part of said conspiracy that **Ounanian** shipped the stolen merchandise that was packaged by **Vogel** and others known and unknown to the Grand Jury.

l. **Ounanian** used a commercial interstate carrier (typically UPS) to transport the stolen merchandise from Xtra Wholesale in the Eastern District of Missouri to purchasers across the United States, including purchasers in New Jersey, New York, Texas, and Idaho.

m. Upon receipt of the merchandise, the purchaser verified that the package contained the items **Ounanian** listed on the invoice. If there were discrepancies in the merchandise **Ounanian** listed on the invoice and the merchandise the purchaser received in the shipment, or if the merchandise was damaged, or too close to its expiration date, the purchaser either: 1) sent the unwanted merchandise back to **Ounanian**; 2) did not pay **Ounanian** for these damaged, soon-to-be-expired, or unwanted merchandise; or 3) negotiated a price for the merchandise.

n. Once Ounanian and the purchaser agreed on what merchandise the purchaser was going to buy, and the amount of the purchase, the purchasers paid **Ounanian** for the merchandise by wiring money to **Ounanian's** Bank of America account in St. Louis,

Missouri or depositing the money in a Bank of America account that belonged to **Ounanian**.

o. When **Ounanian** began selling stolen merchandise to his customer in New Jersey (hereinafter "M.L."), in or around 2009, **Ounanian** initially shipped the stolen merchandise from the Eastern District of Missouri directly to New Jersey where M.L. did business and lived.

p. Later in 2010, **Ounanian** began to ship stolen merchandise from the Eastern District of Missouri to a business acquaintance of M.L. (hereinafter referred to as "T.M.") who was located in Oceanside, New York. In this arrangement, after T.M. received the shipment in Oceanside, New York from **Ounanian**, T.M. informed M.L. whether the shipment was satisfactory and contained merchandise that they wanted. If the merchandise was either damaged, too close to expiration date, or not wanted, M.L. negotiated with **Ounanian** regarding what merchandise he was going to accept and pay for. Once **Ounanian** and M.L. reached agreement, M.L. wired payment to **Ounanian** or deposited it in **Ounanian's** bank account.

q. From 2007 to 2012, **Ounanian** received over $1,000,000 in payments for stolen merchandise that was sent to and purchased by individuals and businesses, in New Jersey, New York, Texas, and Idaho, and **Ounanian** used the proceeds from these payments to acquire money, and purchase, in whole or in part, property.

## OVERT ACTS

6. In furtherance of and to effect the object of the conspiracy, one or more of the co-conspirators committed and caused to be committed one or more of the following overt acts in the Eastern District of Missouri and elsewhere:

   a. On or about February 10, 2011, **Ounanian** paid a booster $1,000.00 for stolen merchandise the booster stole from Walgreens and/or CVS and delivered to **Ounanian**. **Ounanian** paid the booster with a check drawn off of the account of **Ounanian's** business, Xtra Wholesale.

   b. On or about February 11, 2011, **Vogel**, and others known and unknown to the Grand Jury, counted, inventoried, and packaged merchandise that had been delivered to **Ounanian** by one of his paid boosters, and which merchandise had been stolen from Walgreens and/or CVS. **Vogel** verified that she counted and inventoried the stolen merchandise by signing a form that specified the quantity and expiration dates of some of the items that she packaged.

   c. On or about February 11, 2011, **Ounanian** drafted an invoice from Xtra Wholesale to M.L. that listed a number of over-the-counter medicines, cosmetics, and other stolen items that **Ounanian** was going to send to M.L.'s business acquaintance T.M. in Oceanside, NY. The invoice listed, among other things, the name of the merchandise; its normal price; the discounted price; the quantity of each item, and the amount M.L. had to pay for the shipment. This invoice indicated that M.L. would have to pay **Ounanian** $15,663 for this shipment.

    d.    On or about February 14, 2011, **Ounanian** shipped to T.M. in Oceanside, New York the stolen merchandise **Ounanian** listed in his February 11, 2011 invoice to M.L. The merchandise in this shipment had a value of $5,000 or more.

    e.    On or about February 14, 2011, **Ounanian** and M.L. negotiated over the price that M.L. should pay for the contents of the shipment; they agreed to a price of $15,285.

    f.    Also on or about February 14, 2011, M.L. faxed to Xtra Wholesale the invoice **Ounanian** drafted on February 11, 2011, but this invoice also contained written notes to **Ounanian** indicating that M.L. was only going to pay **Ounanian** $15,285 for the February 14, 2011 shipment and not $15,663, which was the amount **Ounanian** included in his invoice.

    g.    On or about February 18, 2011, M.L. wired $15,285 to Xtra Wholesale's Bank of America bank account as payment for the merchandise **Ounanian** sent to T.M.

    h.    From at least 2007 to September 2012, **Ounanian** and **Vogel** engaged in similar conduct in furtherance of and to effect the object of their conspiracy involving the interstate transportation of stolen merchandise from the Eastern District of Missouri to New York, New Jersey, Texas, and Idaho.

All in violation of Title 18, United States Code, Section 371.

## COUNT TWO

The Grand Jury further charges that:

    1.    The allegations contained in paragraphs 1 through 6 of Count One of this indictment are restated and incorporated herein.

2. Beginning at a time unknown to the Grand Jury, but not later than the year 2007, and continuing until September 2012, in the Eastern District of Missouri, and elsewhere

**CHRISTIAN OUNANIAN AND GINA VOGEL,**

the defendants herein, did knowingly and willfully transport, transmit, and transfer in interstate commerce, goods and merchandise of the value of $5,000 or more, to wit: over-the-counter medications, health and beauty products, and other merchandise from Walgreens, and CVS, knowing the same to have been stolen and converted, and did aid and abet each other and other persons.

All in violation of Title 18 United States Code, Section, 2314 and 2.

**FORFEITURE ALLEGATION**

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Sections 981(a) and Title 28, United States Code, Section 2461(c), upon conviction of an offense in violation of Title 18, United States Code, Sections 2314, or conspiracy to commit such offenses in violation of Title 18, United States Code, Section 371, as set forth in Counts One and Two, the defendant shall forfeit to the United States of America any property, real or personal, constituting or derived from any proceeds traceable to said offense.

2. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

3. Specific property subject to forfeiture includes, but is not limited to, the following:

    a. Bank of America Cashier's Check No. 1392576 in the amount of $170,000.00;

  b.  Bank of America Cashier's Check No. 1392575 in the amount of $74,000.00;

  c.  Real property known as 500 Kingsbury Square East, St. Louis, Missouri 63112, together with all appurtenance, improvements, and attachments thereon, bearing a legal description as a Parcel of Ground in Block 5667 of the City of St. Louis, Missouri, Being the Western Part of Lot H as per plat recorded in Book 16, Page 49 of the surveyor's record, City of St. Louis, recorder's office.

4. If any of the property described above, as a result of any act or omission of the defendant(s):

  a.  cannot be located upon the exercise of due diligence;-

  b.  has been transferred or sold to, or deposited with, a third party;

  c.  has been placed beyond the jurisdiction of the court;

  d.  has been substantially diminished in value; or

  e.  has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.


_____

FOREPERSON

RICHARD G. CALLAHAN
United States Attorney


_____
Anthony Franks  #50217MO
Assistant United States Attorney